Lilian Meier, by Her Next Friend, Gustave Meier, Appellee, v. John Hartman and Ida Hartman, His Wife, Defendants. Ida Hartman, Appellant.

Gen. No. 35,733.

Opinion filed May 17, 1932.

OLDS, STOLLE & BELLAIR, for appellant; ERWIN F. STOLLE and JOHN F. BELLAIR, of counsel.

BAYLEY, MERRICK, WEBSTER & GREGORY, for appellee; ROBERT HUNTER, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

From a verdict and judgment for $3,500 against both defendants in an action in case, the defendant Ida Hartman appeals.

No points are raised as to the pleadings. The plaintiff sued to recover damages for injuries sustained by Lilian Meier, a child of five years of age, as the result

of an attack upon her by a pack of collie dogs which the plaintiff alleged were owned and harbored by the defendants when they, the defendants, knew that the dogs were vicious and accustomed to attack and bite mankind. The defendants filed a plea of the general issue and each filed a special plea denying ownership of the dogs which caused the injuries. The child, as a result of the attack, was seriously injured. Dr. Todd, one of the attending doctors, who saw her shortly after the attack, testified: "Most of her clothing was already torn from her or removed some way. It was all torn and just a small piece of her underwear was left around her waist. One shoe, I think the right, was on, and part of the stocking. She was covered with blood and numerous lacerations over the body. The scalp, her head, and ears were slashed and her throat had several deep lacerations and blood was coming from them. She had been chewed or torn severely under the arm pits and about the left hip and across the back. . . . Both legs and hips were torn, some of them rather severely. . . . We put her in the operating room, gave her an anesthetic and proceeded to sew up the wounds. Some were so deep we inserted drains so that the infection could drain out. Dr. Hagen and myself both were operating on her. There were between 250 and 300 lacerations and injuries to be taken care of. It took us between an hour and forty-five minutes and two hours to complete sewing up and draining the injuries. Some of them extended to the bone in the left hip and were the most severe. . . . In my opinion, not all of these scars will entirely disappear. In my opinion about one-third of the scars will be permanent. More than one-third of the lacerations left scars. About seventy-five of these scars will be permanent. . . . The nervousness, to some extent, is permanent, and the impaired circulation in the lower extremity is permanent, in my

opinion. In the later life of the plaintiff the scars will affect appearance. The nervousness will probably be manifest by fear of dogs especially; fear of being alone and fear of the dark. . . . The scars on her throat were above the clavicle. . . . In my opinion they are permanent." The child was in a hospital for three weeks, and for a number of months thereafter was in a wheel chair.

The appellant contends that the plaintiff failed to make out a prima facie case against the defendant Ida Hartman. The appellant's argument in support of this contention is that the plaintiff "offered no testimony as to the ownership of the dogs nor even any direct evidence that they were harbored by this defendant's husband, much less as to their being owned or harbored by this defendant. Even if proof had been offered that they were owned or harbored by this defendant's husband, that fact would not have attached any liability to this defendant," and that there is no evidence that the appellant had any knowledge or notice that any of the dogs were in the habit of biting mankind or had vicious propensities or had ever attacked anyone.

The plaintiff had the right to prove his case by direct or circumstantial evidence.

The defendants lived near the Village of Morton Grove, in Cook county. The defendant John Hartman testified that for 20 years he had been raising collie dogs for the market; that at the time in question he owned the pack of collie dogs, "eight full grown dogs" and a number of puppies; that his wife sometimes sold the dogs; that *"the dogs belong to the family"*; that he always kept the dogs fenced in. Mr. and Mrs. Hartman were the sole members of the family. The witness further testified that at the time in question Mr. Meier, Mrs. Hartman and the witness were at the Hartman place and they heard the barking of the

dogs and that Mrs. Hartman wanted to go to the place where the dogs were; that she said to Mr. Meier that "*she* had a female in heat"; that Mrs. Hartman and Meier ran to the place where the dogs were; that he (the witness) "wanted to go but I could not go so fast." Mr. Meier, the father of Lilian, testified that at the time in question he was standing in front of the defendants' house talking to both defendants, "when *their* dogs rushed out of the front gate and run down the road and set up quite a bit of commotion. Q. What kind of dogs were they? Can you describe them? A. A peculiar strain of collie. They're darker than the ordinary collie. They have a short stubby nose and flat head. . . . They were a darker brown than a real pedigreed collie. Q. Had you ever seen those dogs before? A. I had many times. Q. Where had you seen them? A. In the Hartman house and in the yard. Q. After the dogs ran past the house, did you have any conversation with Mrs. Hartman? A. I didn't but Mrs. Hartman spoke to Mr. Hartman when she heard the dogs making the disturbance on the road and said he better go down and see what the dogs were doing, that they had something down the road, and Mr. Hartman is old not very fast on his feet, so Mrs. Hartman and I started down the road and I heard the dogs getting louder, whatever they were doing, running, and they were—they had something in the meadow. Q. What were the dogs doing? What did you see the dogs doing? A. They were jumping back and forth, nipping at something laying in the hayfield. Q. Could you tell what it was? A. I could not see what they had down on the ground. Q. What did you do? A. I ran. As I got closer, I saw they had a child. Q. What did you do then— A. Why, I hollered— Q. —if anything? A. —at the dogs and at the same time Mrs. Hartman called to the dogs and the dogs left. I got up closer and I found Lillian pretty badly chewed up";

when "I picked Lillian up she had been lying face down and her body, back, legs, and all but her right foot, were literally scratched and chewed, and she was lying between the grass and hayseed." The witness further testified that in the pack that ran from the defendants' home was a dog that the Hartmans called Charlie and which he had seen before that time in the defendants' place; that later that day "Mrs. Hartman said they thought a whole lot of Mrs. Meier, the children and myself and they were going to take care of Lillian and help us. I do not know whether she said pay the doctor bills and hospital bill but they were going to help us. . . . She said she was willing to put on paper that Lillian was to have everything that they had after their death." Upon cross-examination the witness stated the pack of collies "had the run of the house and the yard"; that at times they kept them "in a sort of enclosure in the yard"; that on the day in question "they were out in the front yard"; that as he was standing at the front gate by the roadway with Mr. and Mrs. Hartman the dogs came out of another gate, "the large gate," about 15 feet from the gate where they were standing; that Mr. Hartman yelled at the dogs as they dashed out of the gate but they did not come back; that the Hartman place is inclosed with a big, high fence which in some places had fallen down. The witness further testified that his attention was attracted to dogs "barking, growling," about 300 feet east of the defendants' place; that the dogs that attacked the child were "all full grown dogs"; that he had often seen the pack of dogs, nine or ten in number, running in the defendants' house and yard, and also in the fields. Frieda Schroeder testified that she was present at the Meier's home immediately after the attack and while the child's wounds were being dressed, and that the following occurred: "I asked Mrs. Hartman whether she let the dogs loose

and she said no, the dogs broke out *and if the Charlie dog would not have been with them, it would not have been so bad.* The others were playful''; that a little later, when the doctor took the little girl away, ''Mrs. Meier carried on so and Mrs. Hartman put her arms around her and said she shouldn't cry. She would pay the expense if she had to steal the money.'' On cross-examination this witness testified that Mrs. Hartman also said ''the dogs broke out and she would pay the expenses.'' Arthur Schroeder testified that he was at the Hartman home on the Sunday following the day of the attack and that both defendants and the father of the child were present; that ''Mr. Hartman said he had been talking with his wife they did not have any cash money on hand but they always did like the little child and they would will her some money when they died because they had no friends and no relations here whatever and . . . Mrs. Hartman came in then and they went through the same conversation about—she asked about the child and he told her the same story. She was very bad. She said she felt very sorry for her and Mr. Hartman said to her he had been telling Mr. Meier about willing the child some money and she said yes, they thought that's what they would do. Will their property over to the child and asked Mr. Meier what he thought of it. . . . She said the fence was broke and the dogs got out and she said she thought it was a dog that was going to have puppies, she said, that started it. That's what she thought. And on account of the fence being broke and getting old she asked Mr. Meier if he would come over and help them fix the fence and he said he would.'' On cross-examination the witness testified that Mrs. Hartman said the fence was very old ''and the dogs got out through the broken part of the fence.''

While the defendant Mrs. Hartman, in response to a direct question, stated that the collies belonged to

her husband, nevertheless, she made many statements that tend to support the claim of the plaintiff that the dogs belonged to her and Mr. Hartman. In testifying as to the attack, she said: "At that time I hear dogs barking and you know *we* have a dog kennel and the dogs were barking and I say to Mr. Meier, 'Have you got your dogs along? Strange dogs in there. *We* have got a dog what is in heat,' and he said, 'Och, Gott,' and I run behind him." Repeatedly the witness spoke of the dogs as "their dogs." During her direct examination the following occurred: "Q. A pedigree does not determine whether a dog is Collie or not? A. Yes; they are straight Collies. *I* have got full bred Collies." On cross-examination she further testified: "Q. Was that a thoroughbred collie, too? A. No. Before that *we* had blood hounds. That's long ago. Q. How long have *you* had collies? A. Anyway 15 years. . . . Q. Did you buy the first dog or did Mr. Hartman buy it? A. I cannot remember that. That's too long. Q. Are your dogs registered? A. No sir. . . . Q. You don't sell registered collie dogs? A. No sir. *We* sell full blood collies. Q. *You* sell full blood collies? A. Yes sir. . . . Q. Are your dogs good watch dogs? A. Sure. They are good watch dogs. Q. Are your dogs well trained? A. They are trained. Q. When you say, 'Come here, King,' does King come over to you? A. Yes, sure. . . . Q. This Charlie dog is a dark color dog. He is darker than King? A. He is a little darker. Q. King, is he the head? A. Yes sir. Q. Of *your* kennel? A. Yes." The witness testified that in addition to raising dogs they also raised rabbits, chickens, pheasants, ducks, "everything," and that they all belonged to her but the dogs. The witness denied *in toto* all of the statements that the various witnesses testified she made. She denied that any of the dogs escaped from the Hartman place at the time of the attack and she stated that she did not

see any dogs at the time her attention was called to the barking or when she ran to the place in the prairie where the child was lying. She further testified that she examined the child right after the accident; that she "washed her face and hands and all of her body" and that "she was more scratched than bit"; that she had "no bites on her body"; that she saw only one bite, "just a little one." "Q. A bite behind her ear? A. I did not say bite. . . . Q. What lacerations or bites or scratches did you see on the child's body? A. She had nothing on her body. Q. She had none on her body? A. No sir." We entirely agree with the contention of the plaintiff that testing the testimony of Mrs. Hartman in the light of all the other facts and circumstances in the case, the jury were justified in giving it little, if any, weight. As we read the record Hartman was old, slow, and not over bright, and Mrs. Hartman was the dominant and controlling force in the Hartman establishment and undoubtedly had an interest in the dogs in question. We have not deemed it necessary to consider the question as to whether Mrs. Hartman, even if she had no ownership in the dogs, could be held liable upon the theory that she harbored or kept them.

Dale Kittelson testified that the Hartman dogs had attacked him in the presence of the defendant John Hartman, and Walter Vogt testified to another occurrence when the Hartman dogs attacked him, also in Mr. Hartman's presence. It is undisputed that the Hartmans had a sign in front of their house reading, "Beware of the dogs." In *Domm v. Hollenbeck*, 259 Ill. 382, the court held that the knowledge of vicious propensities of dogs "may be made by evidence of facts and circumstances from which an inference of knowledge arises." There is testimony to the effect that the defendant Mrs. Hartman made certain admissions which indicated a knowledge that the "Charlie

dog'' was vicious enough to attack the child and her belief that the other dogs would not have joined in the attack had it not been for him.  This is not a case where a single dog is charged with attacking an individual, and it is a matter of common knowledge that a pack of dogs is more likely to manifest vicious propensities than a single dog.  ''The call of the wild'' is very much more likely to develop in a pack than in a single dog.  In the instant case the defendants claimed that they kept the pack in a place surrounded by a high fence and never allowed them out of this inclosure.  The testimony shows that when Mrs. Hartman heard the dogs barking she did not then see them and did not know what they were doing, nevertheless, she immediately called them and *ran* to the place of the occurrence.  Her actions in this regard tend strongly to show that she knew that it meant danger to human beings for the pack to be at large.  The savage character of the attack made by the entire pack upon the little child indicated clearly the real nature of the dogs, and the jury were fully justified in finding that the defendants had knowledge that if the pack of dogs escaped from the inclosure and ran at large they were very likely to manifest vicious propensities.

The appellant contends that the motion made at the close of the plaintiff's case should have been allowed; that at that point in the case the plaintiff had not shown who owned or harbored the dogs and that ''there was no evidence to show knowledge on the part of Mrs. Hartman, of any of the dogs having vicious propensities.''  It is a sufficient answer to this contention to say that the defendants did not stand by their motion for a directed verdict at the close of the plaintiff's case and that they thereafter offered evidence in their own behalf, and, therefore, the instant contention is without merit.

The appellant contends that "the verdict was excessive, was the result of passion and prejudice and based on speculation." This contention is without the slightest merit.

The appellant contends that the trial court erred in not directing a verdict of not guilty for the defendants as to plaintiff's third count. The defendants, after verdict, filed a written motion for a new trial, in which nine grounds are specified. None of the grounds has any reference to the instant contention, and therefore it cannot now be considered by us. (See *Anderson v. Karstens*, 297 Ill. 76.) Many other authorities to the same effect might be cited, if it were necessary.

The appellant contends that the court erred in giving to the jury, at the instance of the plaintiff, instruction number eight. As none of the grounds assigned in the written motion for a new trial has any reference to instructions the instant contention cannot be considered.

The appellant, Ida Hartman, has had a fair trial and the judgment of the circuit court of Cook county should be and it is affirmed.

*Affirmed.*

GRIDLEY, P. J., and KERNER, J., concur.